72 U.S. 574
 18 L.Ed. 677
 5 Wall. 574
 THE PEARL.
 December Term, 1866
 
 1
 APPEAL from the District Court of the United States for the Southern District of Florida, restoring, on payment by the claimants of expenses and costs, the steamer Pearl, captured for intent to break the blockade of our Southern coast, established during the late rebellion; the question being chiefly of fact.
 
 
 2
 Mr. Ashton, Assistant Attorney-General, for the United States, Mr. Marvin, contra, for the claimants.
 
 
 3
 The CHIEF JUSTICE, previously stating the case, delivered the opinion of the court.
 
 
 4
 The Pearl was captured on the 20th January, 1863, by the United States ship of war Tioga, between the Bahama banks and Nassau.
 
 
 5
 The papers found on board showed that she was a British vessel, belonging to one George Wigg, of Liverpool; that he became owner on the 24th of September, 1862; that one George M. Maxted was appointed master at Glasgow, where she was purchased, on the 25th of September; that one Matthew L. Irving succeeded him on the 13th of October, also at Glasgow; and that one William Jolly was appointed in his place, at Cork, on the 22d of November. Jolly was master at the time of capture.
 
 
 6
 She carried no cargo except ten bales of seamen's jackets and cloth, shipped by Wigg at Cork and consigned to H. Adderly & Co., at Nassau, to whom the vessel was also consigned. This firm has become well known in this court as largely engaged in the business of blockade-running.
 
 
 7
 Several of the seamen, examined in preparation for the primary hearing, concurred in representing the vessel as destined to the Rebel Confederacy.
 
 
 8
 One of them was present when the vessel was purchased and heard Wigg and Maxted negotiating for her. According to them, Maxted acted as principal rather than as subordinate, and was engaged about the same time in buying other vessels of the same class as the Pearl, of small size and light draft, and what was said impressed the witness with the belief that all of them were destined to trade with the Confederate ports.
 
 
 9
 Several other seamen made similar statements. It seemed to be a common understanding among them that the Pearl was to be engaged in running the blockade, and there was much talk about the practicability and probability of her getting into the Confederate ports, and especially the port of Charleston. 'It was notorious,' said one of them, 'in Glasgow and Cork, before and after the sailing of the Pearl, that she was engaged to run the blockade, and that she was bought and fitted and sailed for that especial purpose.'
 
 
 10
 One of the firemen stated that Maxted represented to him and his mates, as an inducement to ship on the Pearl, that they might reship on her or in some vessel in the Confederate service, with large pay, and have, as a bonus, the ten pounds return-money which was to be paid them on discharge at Nassau. The same witness stated that Maxted, after leaving the Pearl, took command of a screw steamer, the Thistle, from Liverpool for Nassau.
 
 
 11
 The testimony of the second officer of the Pearl was substantially to the same effect. He was engaged at Glasgow for the general management on board, by Maxted, shortly before she sailed; and after a fortnight or more, shipped as second officer. He understood the purchase by Wigg to be made for parties in the Confederate States.
 
 
 12
 The master and the first mate testified that they knew nothing of any destination of the ship beyond Nassau. Neither knew to whom the vessel belonged, except from the papers, but believed that she was owned by Wigg. All they knew of the cargo was that it was consigned to Adderly & Co.
 
 
 13
 The cause was heard upon the preparatory evidence on the sixth of May, and on the same day, and before any decree was pronounced, a motion for further proof was made, upon affidavits by Wigg, Maxted, and several of the seamen; and on the 25th of May it was 'ordered that the claimant of the ship be allowed to produce further evidence, by his own oath or otherwise, touching his interest therein and the use he intended, at the time of the capture, to make of the vessel after her arrival at Nassau; the trade or business he intended she should be engaged in, and for what purpose she was going to that port; and that the claimant of the goods have time to produce an affidavit of his right and title therein, and to produce such other proof of neutral ownership as he may be advised.'
 
 
 14
 No new evidence at all appears to have been taken under this order; but the affidavits used on the notice, and a Nassau newspaper containing two government notices, seem to have been admitted as further proof on the final hearing.
 
 
 15
 Some of the affiants were seamen who had been examined at Key West. They denied having made some statements contained in the depositions put into the cause by the prize commissioners; but they do not deny the conversations and understandings to which they then testified. The substance of their new affidavits was that the Pearl, at the time of her capture, was on a bona fide voyage to Nassau. The affidavits of the seamen, not before examined, were to the same effect. They are entitled to very little weight as further proof.
 
 
 16
 The affidavit of Wigg was positive to his ownership; to the non-existence of Confederate ownership; and to the allegation that the Pearl, at the time of her capture, was engaged in the bona fide prosecution of a lawful voyage from Great Britain to Nassau, and that he had no knowledge or belief that any cause existed which rendered her liable to capture.
 
 
 17
 But he said nothing at all on the most important point in respect to which he was allowed further proof, namely, what use he intended to make of the steamer after arrival in Nassau; and in what trade or business he intended she should be engaged; and for what purpose she was going to that port.
 
 
 18
 The affidavit of Maxted also asserted the sole ownership of Wigg; denied that Wigg was agent for the Confederate States or connected in business with any person residing in either of them; denied that he himself made any contract with any one to run the blockade, or had any conversation with any of the seamen in relation to shipping in any vessel to run the blockade; and concluded with an averment, that of his own knowledge the steamer was purchased by Wigg to carry mails for the British government between the West Indies and Cuba, under proposals offering five thousand pounds per annum for three years.
 
 
 19
 This affidavit, if entitled to credit, might repel the inference, warranted by the other evidence, that the Pearl was purchased and sailed with intent to break the blockade. But Maxted's own connection with the purchase of this and other vessels, and his own engagement in the suspicious commerce with Nassau, do not allow us to regard his evidence as of much value, especially in the absence of any satisfactory affidavit from Wigg himself.
 
 
 20
 It must be remarked, also, that the government notices for proposals, put in evidence for the claimant, apparently for the purpose of supporting the statement by Maxted, do not support it at all. They invite proposals for sailing, not for steam vessels, and relate to communication among the Bahama Islands, not to communication between Cuba and the West Indies.
 
 
 21
 On the whole, we are constrained to say that we perceive no reasonable ground for believing that the Pearl was not at the time of capture destined to employment in breaking the blockade. We are not satisfied that her voyage was to terminate at Nassau; but are satisfied, on the contrary, that she was destined, either immediately after touching at that port, or as soon as practicable after needed repairs, for one of the ports of the blockaded coast.
 
 
 22
 The vessel, therefore, in conformity with the principles recognized by us in several cases, must be condemned.
 
 
 23
 As to the ten bales of merchandise, the evidence showed ownership in Wigg, rather than any other person; but no claim was put in by him. They were claimed in behalf of Adderly & Co., by the captain; but, in his deposition, he disclaimed all knowledge of the ownership, except from the consignment. No affidavits of title or neutral ownership have been put in by Adderly & Co., under the notice obtained by the claimants, for further proof. This neglect cannot be construed otherwise than as an admission that they are not entitled to restitution.
 
 
 24
 A decree of condemnation, therefore, must pass against the merchandise as well as the ship.
 
 
 25
 DECREE ACCORDINGLY.